| | | |
|---|---|---|
| STATE OF SOUTH DAKOTA | ) | IN CIRCUIT COURT |
| | :SS | |
| COUNTY OF MINNEHAHA | ) | SECOND JUDICIAL CIRCUIT |

| | | |
|---|---|---|
| SIOUX VALLEY RURAL | ) | Civ. No. 15-_____ |
| TELEVISION, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | COMPLAINT AND |
| | ) | |
| SPEEDCONNECT, LLC, | ) | MOTION FOR INJUNCTION |
| | ) | |
| Defendant. | ) | AND TEMPORARY RESTRAINING |
| | | ORDER |

Sioux Valley Rural Television, Inc., ("Sioux Valley Wireless"), for its Complaint and Motion against Defendant SpeedConnect, LLC, ("SpeedConnect") states and alleges as follows:

1.    Sioux Valley Wireless is a business corporation in good standing in the State of South Dakota providing internet services to customers in Minnehaha County and other contiguous regions.

2.    SpeedConnect, LLC, ("SpeedConnect"), is a business providing wireless internet services to customers in Minnehaha County and other contiguous regions.

3.    In 2011, Digital Bridge Spectrum Corporation and Sioux Valley Wireless entered a Long Term De Facto Spectrum Lease Agreement, ("Agreement"), a copy of which is attached in relevant parts as Exhibit "1," providing for shared use of channels each business relied upon in providing internet services to customers.

EXHIBIT

A

4.     In 2012, Digital Bridge Spectrum Corporation assigned its interest in the Agreement to SpeedConnect, with the approval of Sioux Valley Wireless and the Federal Communication Commission. At this time, SpeedConnect is the successor in interest to all rights and responsibilities of Digital Bridge Spectrum Corporation pursuant to the Agreement.

5.     On December 23, 2014, SpeedConnect alleged Sioux Valley Wireless' breach of the Agreement. Notice is attached as Exhibit "2."

6.     On January 12, 2015, after an attempt to resolve the alleged breach of the Agreement, SpeedConnect reiterated its belief that Sioux Valley Wireless breached their Agreement and gave notice that it intends to terminate the Agreement on March 23, 2015. Notice is attached as Exhibit "3."

7.     On January 27, 2015, SpeedConnect alleged additional breach of the Agreement by Sioux Valley Wireless. Notice is attached as Exhibit "4."

8.     Sioux Valley Wireless has performed and continues to perform all duties under the Agreement including attempting to resolve the disputed allegations and denies any breach on its part of the Agreement.

9.     On February 17, 2015, Sioux Valley Wireless received revised notice that SpeedConnect intends to accelerate its threatened action and terminate the Agreement on February 23, 2015. Notice is attached as Exhibit "5."

10.     As the Agreement recognizes at Article X, 10.2(b), Sioux Valley Wireless and its customers will incur immediate and irreparable damage if the Agreement is

terminated by SpeedConnect including loss and/or degradation of internet services for which pecuniary damages would be difficult to ascertain and for which pecuniary damages would not afford adequate relief.

11.     Pursuant to Article XI of the Agreement, any dispute arising from the Agreement is to be submitted to arbitration.

12.     SpeedConnect has not initiated arbitration as contemplated by the Agreement.

13.     Pursuant to Article XI, 11.3 of the Agreement, Sioux Valley Wireless has reserved the right to move this Court for injunctive relief.

WHEREFORE, Sioux Valley Wireless requests the Court's Temporary Restraining Order and, after further hearing, its Permanent Injunction restraining and enjoining SpeedConnect, LLC from terminating the Agreement between these parties prior to a time it has initiated and completed arbitration of any dispute.  Additionally, Sioux Valley Wireless requests its costs and other relief to which it is entitled by way of this filing.

Dated this  _1 7_  day of February, 2015.

SIOUX VALLEY RURAL TELEVISION,
INC., d/b/a SIOUX VALLEY WIRELESS

By:   _Jim McCarthy_
      Tim McCarthy
      Its Manager and CEO

## **VERIFICATION**

STATE OF SOUTH DAKOTA )
                       :SS
COUNTY OF MINNEHAHA )

Tim McCarthy, being first duly sworn on oath, deposes and states that he is an

individual residing in South Dakota, that he is the Manager and CEO of Sioux Valley

Rural Television, Inc., d/b/a Sioux Valley Wireless, Plaintiff, and that in that capacity, has

read the attached Motion for Injunction, knows the contents thereof, and that the same is

true of his own knowledge, except as to matters therein stated on information and belief,

and as to those matters, he believes them to be true.

SIOUX VALLEY RURAL TELEVISION,
INC., d/b/a SIOUX VALLEY WIRELESS

By: _Jim McCarthy_
    Tim McCarthy
    Its Manager and CEO

Subscribed and sworn to before me

this / 7 day of February, 2015.

NOTARY PUBLIC * SOUTH DAKOTA
My Commission Expires: /0 - / - / 5

(SEAL)    

4

## NOTICE OF APPEARANCE

Lynn, Jackson, Shultz & Lebrun, P.C., of 110 North Minnesota Avenue, Suite 400,

P.O. Box 2700, Sioux Falls, South Dakota  57101-2700, hereby note their appearance on

behalf of the Plaintiff above named.

Dated this  _17_  day of February, 2015.

LYNN, JACKSON, SHULTZ & LEBRUN, P.C.

By:

R. Alan Peterson
Miles F. Schumacher
PO Box 2700
Sioux Falls, SD  57101-2700
Phone:  605-332-5999
Fax:  605-332-4249
Email:  rpeterson@lynnjackson.com
        mschumacher@lynnjackson.com

**Execution Version**

---

## SHORT TERM DE FACTO SPECTRUM LEASE AGREEMENT

**by and between**

**DIGITALBRIDGE SPECTRUM CORP., a Delaware corporation**

**and**

**SIOUX VALLEY RURAL TELEVISION, INC., a South Dakota corporation**

Dated as of April 27, 2011

---

*DBC Confidential and Proprietary*
4949984



**Execution Version**

## SHORT TERM DE FACTO SPECTRUM LEASE AGREEMENT

This Short Term De Facto Spectrum Lease Agreement (the "Agreement"), dated as of April 27, 2011 is entered into by and between Sioux Valley Rural Television, Inc. ("Licensee") and DigitalBridge Spectrum Corp. ("DBC") (each of Licensee and DBC, a "Party," and collectively, the "Parties"). This Agreement shall be binding upon the Parties as of the date of execution, and those rights, duties and responsibilities that can be performed by the Parties prior to Federal Communications Commission ("FCC") Consent to the FCC Short Term Lease Application by Final Order (as hereinafter defined) shall be performed.

### RECITALS

**WHEREAS**, Licensee and DBC executed a Spectrum Acquisition Agreement dated January 29, 2008 for the purchase by DBC of 44 MHz of Broadband Radio Service ("BRS") spectrum for use throughout the service areas for the following channels: E2, E3, F1, F2, F3, H1, H2 and H3. The FCC-mandated transition of the channels to the new band plan is complete (the "Transition"), and the channels are contiguous and authorized in a spectrum block from 2629.5 MHz to 2673.5 MHz; and

**WHEREAS**, Licensee wishes to provide DBC with access and exclusive use of channels E1, E4 and F4 (the "Channels") within the respective channel GSAs.

**NOW, THEREFORE**, in consideration of the premises and the mutual promises, and the consideration already paid under the Spectrum Acquisition Agreement, and the representations and covenants contained herein, Licensee and DBC agree as follows:

### ARTICLE I

### Definitions

When used in this Agreement the following terms shall have the meanings as specified below (additional terms are defined elsewhere herein):

Affiliate shall mean with respect to any entity, an entity that, directly or indirectly, through one or more intermediaries, controls, is controlled by or is under common control with another entity, where "control" means to own or control over fifty percent (50%) of the voting power of the applicable entity or otherwise to direct or cause the direction of the management and policies of such entity, whether through ownership of voting securities or by contract or otherwise, but any such entity shall be deemed to be an Affiliate only so long as such control exists; Affiliate shall also mean any entity to whom DBC sells spectrum capacity in bulk over the Leased Transmission Capacity, and any entity with whom DBC partners for the provision of wireless services over the Leased Transmission Capacity. Any of the foregoing transactions with "Affiliates" will be at arm's length and will comply with Generally Accepted Accounting Principles and the regulations of the Securities and Exchange Commission.

Agreement shall have the meaning ascribed to it in the Preamble.

Article shall mean one of the articles of this Agreement unless reference specifically is made to a source other than this Agreement.

Channel or Channels shall mean the E1, E4, and F4 channels licensed to Licensee and authorized for use in South Dakota under a number of licenses, including: WMX358 (E1 and E4) and WMX344 (F4).

Communications Act shall mean the Communications Act of 1934, as amended (47 U.S.C. § 151 et seq.).

Confidential Information shall have the meaning ascribed to it in Section 13.3.

DBC's Service or Service shall mean the provision of wireless services over the Leased Transmission Capacity in the Market including, but not limited to, any IP-enabled service, any one-way or two-way digital communications, telephony services, web hosting services, video services and Internet access services or any other lawful uses, technologies or architectures DBC or its Affiliates may choose or the FCC may now or hereafter permit for BRS spectrum.

Event of Default shall have the meaning ascribed to it in Section 10.1(b).

FCC shall mean the Federal Communications Commission or any successor agency.

FCC Consent shall mean FCC approval by Final Order of an FCC Short Term Lease Application.

FCC Long Term Lease Application shall have the meaning ascribed to it in Section 2.2(b).

FCC Rights shall have the meaning ascribed to it in Section 3.7.

FCC Rules shall mean Title 47 of the Code of Federal Regulations, as amended at any time and from time to time, and FCC decisions, policies, reports and orders issued pursuant to the adoption of such regulations.

FCC Short Term Lease Application shall have the meaning ascribed to it in Section 6.1.

Final Order shall mean a written action or order issued by the FCC: (a) which has not been reversed, stayed, enjoined, set aside, annulled or suspended; and (b) with respect to which (i) no timely-filed requests have been filed for administrative or judicial review, reconsideration, appeal or stay and the time for filing any such requests, and the time for the FCC to set aside the action on its own motion, has expired, or (ii) in the event of review, reconsideration or appeal, the action or order has been affirmed and the time for further review, reconsideration or appeal has expired.

2

**Execution Version**

Governmental Authority shall mean any court, or any federal, state, municipal or other governmental authority, department, commission, board, agency or other instrumentality (domestic or foreign), including the FCC.

Governmental Authorizations means any license, permission, approval, authority or consent required to be obtained from a Governmental Authority in order to maintain the Licenses.

Including shall mean "including, without limitation".

Law or Laws means applicable common law and any statute, ordinance, code or other law, rule, permit, permit condition, regulation, order, decree, technical or other standard, requirement or procedure enacted, adopted, promulgated, applied or followed by any Governmental Authority including, but not limited to, FCC Rules.

Leased Transmission Capacity shall mean the entire Transmission Capacity on the Channels and the G-group channels (WNC547) in the Market.

Licenses shall mean the Licenses described in the definition of "Channels" above.

Licensee shall have the meaning ascribed in the Preamble.

Market shall have the collective geography covered by all of the Licenses and WNC547.

Non-Terminating Party shall have the meaning ascribed to it in Section 13.5.

Parties or Party shall have the meaning ascribed to it in the Preamble.

Proponent and Co-Proponent shall have the meaning ascribed to it in Section 27.1231 of FCC Rules.

Term shall have the meaning ascribed to it in Section 2.2(a).

Termination Date shall have the meaning ascribed to it in Section 10.1(d).

Terminating Party shall have the meaning ascribed to it in Section 13.5.

Tower shall have the meaning ascribed to it in Section 5.4.

Transition shall have the meaning ascribed to it in the Recitals.

Transmission Capacity shall mean the entire transmission capacity of all BRS Channels licensed to, and EBS channels leased to Licensee in the Market that are subject to this Agreement, including all subcarriers, subchannels, blanking intervals, second audio carriers, guardband and any other spectrum, capacity, rights or transmission medium associated with the channels, as the same exists today and as may be granted to Licensee by the FCC during the Term.

3

*DBC Confidential and Proprietary*

**Execution Version**

Unimpaired with respect to the Licenses means that there has been material compliance with all Laws and FCC Rules related to the Licenses, no interest or future interest of any kind in the Licenses has been leased or hypothecated to any third party in any manner, no interference has been allowed and no interference consents or interference agreements have been entered into or granted with respect to the Licenses that limits the use by DBC of the Leased Transmission Capacity within the Market, except for this Agreement no part of the service area or frequencies associated with the Licenses have been partitioned or disaggregated, the Licenses are not subject to any pending claims or litigation in any forum, and, all state, local and federal permits, licenses, franchises, variances, exemptions, orders, operating rights and other state, local and federal governmental authorizations, consents and approvals, if any, necessary to hold the Licenses and lease capacity on it to DBC as contemplated herein have been received.

## ARTICLE II

### Recitals; Term; Leased Transmission Capacity

2.1     Recitals.

The recitals and definitions set forth at the beginning of this Agreement are integral to this Agreement, are to be considered substantive provisions hereof, and are incorporated herein by reference.

2.2     Term.

(a)     Subject to the termination rights contained in Article X, the initial term shall begin on the date the FCC approval of the FCC Short Term Lease Application filed by the Parties pursuant to Section 6.1 becomes a Final Order, and shall continue for period of one (1) year (the "Term") or until such time as the FCC approves a Long Term Lease Application filed by the Parties.

4

**Execution Version**

2.3    Exclusivity.

Licensee agrees that it shall not, during the Term, negotiate or discuss with any third party the use, lease, sale, transfer or assignment of the Leased Transmission Capacity, or any part thereof, or any right or option therefore, whether such use, lease, sale, transfer, option or assignment is to take place during the Term or thereafter.

ARTICLE III

Spectrum Lease

3.1    Leased Transmission Capacity.

Licensee covenants and agrees that so long as DBC is not in breach of this Agreement, DBC may peaceably and quietly enjoy the Leased Transmission Capacity throughout the Term, subject at all times to the terms and conditions of this Agreement. DBC shall be entitled to use the Leased Transmission Capacity for any purpose allowed by the FCC. In furtherance of the foregoing, Licensee shall not take or fail to take any action that may have a material adverse effect on DBC's right to possession and peaceable enjoyment of the Leased Transmission Capacity.

3.2    Spectrum Changes.

Prior to taking any voluntary action pursuant to which Licensee converts, swaps, exchanges, relinquishes or in any way transfers, its Licenses or the Channels for the same, similar or different spectrum, licenses or channels (the "FCC Rights"), Licensee will obtain DBC's written consent to such action, not to be unreasonably withheld. This Agreement will be automatically amended to cover the FCC Rights. Unless otherwise required by the FCC, Licensee will not take any action with regard to the Licenses or the Channels other than in accordance with this Agreement or as consented to by DBC in writing.

ARTICLE IV
Reserved

ARTICLE V
Additional Obligations and Rights

5.1    Reserved.

5.2    Ownership of Facilities.

The Parties acknowledge and agree that the facilities constructed by DBC or its Affiliates for any of the Transmission Capacity, and any modifications thereof, shall be owned by DBC or the Affiliate.

5.3    Tower.

*DBC Confidential and Proprietary*

**Execution Version**

DBC shall, in its own name or in an Affiliate name, and at its sole cost and expense, arrange for the right to use any Tower facilities required in connection with operation of the Leased Transmission Capacity (the "Tower"). Licensee shall have no independent rights to use the Tower facilities.

## ARTICLE VI

### Filings

6.1    Application for Lease Approval.

Within ten (10) business days following the execution of this Agreement, and prior to consummating the transfer of *de facto* control of the Leased Transmission Capacity, the Parties agree to cooperate as required to prepare and file with the FCC all forms and related exhibits, certifications and other documents necessary to obtain the FCC's consent to this Agreement and satisfy the FCC's requirements for short term de facto lease approval as set forth in 47 C.F.R. § 1.9035(c) (such filing being the "FCC Short Term Lease Application"). Each Party covenants and agrees that it will fully cooperate with the other, and do all things reasonably necessary to timely submit, prosecute and defend the FCC Short Term Lease Application and the Term as contemplated herein, including responding to any petitions for reconsideration or FCC reconsiderations of the grant of the FCC Short Term Lease Application, and will promptly file or provide the other Party with all other information which is required to be provided to the FCC in furtherance of the transactions contemplated hereby. Any fees associated with the filing of the FCC Short Term Lease Application shall be paid by DBC. To the extent Licensee is required to file this Agreement with the FCC, Licensee shall first notify and consult with DBC, and will redact all information from the Agreement which DBC reasonably designates as confidential including, but not limited to, all payment information.

6.2    FCC Filings; Consents.

Upon DBC's reasonable request, and within five (5) days of Licensee's receipt of such request, Licensee shall promptly review, execute and file (if necessary), and, together with DBC, prosecute all lawful notifications, applications, petitions, waivers, appeals, amendments, and other related documents necessary to secure FCC approval for Licensee's and DBC's intended uses of the Channels. Licensee shall promptly file any requests for extension of construction periods or performance benchmarks reasonably requested by DBC; DBC will cooperate with Licensee in making and supporting any extension requests. Licensee shall promptly, within fifteen (15) business days of its receipt, review, execute and provide DBC with any "no objection" letters, interference consent agreements or retransmission consents that DBC may reasonably request. During the Term, Licensee shall not make any filings (other than routine, ministerial filings) with any Governmental Authority, including the FCC, without prior written consent from DBC, not to be unreasonably withheld, conditioned or delayed, and Licensee shall not provide any "no objection" letters, interference consents and/or retransmission consents to any third party without prior written consent from DBC.

*DBC Confidential and Proprietary*

**Execution Version**

6.3     Maintenance of Channels.

Licensee shall use its best efforts to maintain in full force and effect throughout the Term its Licenses and any associated authorizations for the Channels, it shall maintain its qualifications to hold such Licenses and authorizations, and it will comply in all material respects with its regulatory requirements as an FCC licensee. Licensee agrees that it will timely file its FCC Short Term Lease Applications as provided herein and in the FCC's Rules. Each Party shall, with respect to its activities and operations related to the Channels, comply with all FCC Rules and all other applicable laws, rules and regulations of every kind. Licensee shall provide to DBC a copy of any notice received from the FCC concerning the Licenses within five (5) business days of receipt.

## ARTICLE VII

## Covenants and Obligations of the Parties

In addition to the agreements and covenants of the Parties contained elsewhere in this Agreement, the Parties agree to the following:

7.1     Covenants and Obligations of DBC.

During the Term, DBC shall at its sole cost, faithfully fulfill the following covenants and obligations:

(a)     Obtain Authorizations. Obtain all Governmental Authorizations necessary to perform its obligations hereunder.

(b)     Operate in Accordance with Law. Construct, operate and maintain its equipment, and provide the Services it is authorized to provide under this Agreement, in accordance with this Agreement and all applicable statutes and regulations including, but not limited to, FCC Rules and other Laws applicable to the equipment and/or services. Without limiting the generality of the foregoing, DBC shall cooperate at Licensee's reasonable request with Licensee's fulfillment of its responsibilities as an FCC Licensee.

(c)     Avoid Interference. Avoid causing interference in contravention of FCC Rules to Licensee's lawful transmissions or to the lawful transmissions of any third party, and operate and maintain its equipment consistent with this obligation; provided that, in the event any interference in contravention of FCC Rules is caused by DBC's operations or equipment, it shall be DBC's obligation to resolve such interference in accordance with FCC Rules.

(d)     Non-FCC Governmental Authorizations. At its own expense, prepare, file and prosecute all applications necessary to secure and maintain in force all non-FCC Governmental Authorizations required for it to operate or lease the Leased Transmission Capacity, and to use commercially reasonable efforts to defend against any proceeding that could result in the termination of such Governmental Authorizations.

*DBC Confidential and Proprietary*

**Execution Version**

7.2     Covenants and Obligations of Licensee.

During the Term, Licensee shall at its sole cost, faithfully fulfill the following covenants and obligations:

(a)     Operate in Accordance with Law.  Operate and maintain its equipment relating to this Agreement, if any, in accordance with all FCC Rules and applicable Laws.

(b)     Avoid Interference.  Avoid causing interference in contravention of FCC Rules to DBC's lawful transmissions or to the lawful transmissions of any third party, and operate and maintain its equipment relating to this Agreement, if any, consistent with this obligation; provided that, in the event any interference in contravention of FCC Rules is caused by Licensee's operations, it shall be Licensee's obligation to resolve such interference in accordance with FCC Rules.

(c)     Maintain Licenses.  Use best efforts to maintain in full force and effect and in its name the Licenses, as well as all permits and other state or local government authorizations related thereto, and to continually receive FCC Consent to the leasing arrangement provided in this Agreement.  The failure to maintain the licenses or FCC Consent to the leasing arrangement shall not be deemed a default by Licensee if the failure was beyond the reasonable control of Licensee, and Licensee used its best efforts to preserve the Licenses and/or FCC Consent.

(d)     No Encumbrances.  Throughout the Term, ensure that the Licenses are and remain Unimpaired.

(e)     Obtain Modifications.  Subject to reimbursement from DBC, request from the FCC any modification to the Licenses or to any FCC authorization relating to the Licenses that is requested in writing by DBC, so long as such modifications do not impair the value of the Channels upon the expiration or termination of this Agreement.

(f)     Prohibited Modification of Spectral Platform.  During the Term of this Agreement, Licensee shall not subdivide, combine, alter, or enter into any spectrum sharing or time-sharing arrangements with respect to the Transmission Capacity without the prior written consent of DBC, not to be unreasonably withheld.

7.3     Additional Covenants of the Parties.

(a)     Effect of Agreement.  Notwithstanding anything in this Agreement to the contrary, and subject to prior FCC Consent to this Agreement, the Parties expressly acknowledge that this Agreement is designed to transfer de facto, but not de jure, control of the leased spectrum to DBC in accordance with Sections 1.9010 and 1.9035 of FCC Rules.  This Agreement: (i) does not and will not vest in DBC, or constitute, create or have the effect of constituting or creating, de jure control, direct or indirect, over Licensee or the Licenses, which ownership or de jure control remains exclusively and at all times in Licensee; and (ii) does not and will not constitute the transfer, assignment, or disposition in any manner, voluntary or

involuntary, directly or indirectly, of the Licenses or the transfer of control of Licensee within the meaning of Section 310(d) of the Communications Act other than for spectrum leasing purposes. During the Term, DBC will not take any action inconsistent with or contrary to Licensee's de jure control, as that term is construed by the FCC, over the Licenses. During the Term, DBC will not hold itself out to the public as the holder of the Licenses.

(b)     Responsibilities for Complying with Communications Act.  DBC hereby assumes primary responsibility for complying with the Communications Act and applicable FCC Rules with respect to the Leased Transmission Capacity, and Licensee is relieved of primary and direct responsibility for ensuring that operations on the Leased Transmission Capacity comply with the Communications Act and FCC Rules.  However, Licensee shall remain responsible for complying with FCC Rules with regard to the spectrum it retains use of, Licensee is responsible to comply with other FCC Rules that specifically apply to licensees in short term de facto leasing arrangements, and Licensee is responsible for its own FCC Rule violations and any ongoing violations or other egregious behavior pertaining to use of the Licenses about which it is aware.

(c)     DBC Compliance with Secondary Markets Rules.  DBC shall comply with applicable secondary markets leasing rules as set forth in Section 1.9000 et seq. of FCC Rules. DBC acknowledges that this Agreement may be revoked, cancelled or terminated by Licensee or by the FCC if DBC materially fails to comply with such rules; provided, however, that, to the extent permitted by the FCC, before Licensee may exercise such termination right, it shall first provide DBC with notice of an Event of Default pursuant to Section 10.1(a)(iii) hereof, and provide DBC with an opportunity to cure such default or failure as specified therein.  If the Licenses are revoked, cancelled, terminated or otherwise ceases to be in effect, DBC understands that it will have no continuing authority or right to use the leased spectrum, unless otherwise authorized by the FCC, or unless the FCC grants DBC special temporary authority to operate as contemplated in Section 10.1(c).

(d)     Provide Information.  The Parties shall promptly provide each other with all correspondence, notices, and filings by it or any third party that relate to the Licenses, including all Transition correspondence, any applications relating to the Licenses, and all communications and correspondence by Licensee to the FCC or by the FCC to Licensee.  The Parties shall provide each other with prompt written notice of any conversation with the FCC or third parties that would be reasonably likely to materially and adversely affect either party's rights under this Agreement.

## ARTICLE VIII

### Taxes

8.1     Property Taxes.

All property taxes, and other taxes, if any, applicable to DBC's equipment shall be the responsibility of DBC, and all property taxes and other taxes applicable to the equipment that Licensee owns shall be the responsibility of Licensee.

8.2     Sales and Related Taxes.

All sales taxes, message taxes, utility taxes, excise taxes and other taxes, and federal or state regulatory charges or fees, applicable to DBC's Service, if any, shall be the responsibility of DBC. All sales taxes, message taxes, utility taxes, excise taxes and other taxes, and federal or state regulatory charges or fees applicable to Licensee's operations, if any, shall be the responsibility of Licensee. Licensee shall be responsible for payment of federal or state taxes, if any, on its taxable income.

## ARTICLE IX

### Representations and Warranties

9.1     Joint Representations and Warranties.

Each of the Parties represents and warrants to the other from execution of this Agreement and throughout the Term as follows:

(a)     Brokers.  To the extent either Party employs a broker with respect to the transactions contemplated by this Agreement, such Party shall be solely liable to pay fees due to such broker.

(b)     No Untrue Document.  No contract or document that it has shown to the other Party in connection with the negotiation or execution of this Agreement contains any untrue statement of a material fact or omits to state a material fact necessary in order to make the statements contained therein not misleading, except as to material facts which the representing Party had no reasonable basis to question.

(c)     No Judgments.  To the best of its knowledge, there is no outstanding judgment, litigation, or proceeding, pending or threatened, involving or affecting the Licenses or the transactions contemplated by this Agreement (other than matters of general applicability to BRS licensees generally).

(d)     No Disqualification.  To the best of its knowledge, there has been no determination by a Governmental Authority that would disqualify it from performing its obligations hereunder, or would cause the FCC to decline to approve this Agreement or the transactions contemplated herein.

(e)     Filings.  There is no requirement applicable to it to make any filing, declaration or registration with, or to obtain any permit, authorization, consent or approval of, any Governmental Authority or third party as a condition to the lawful consummation of the transactions contemplated by this Agreement to be executed pursuant hereto, except for receiving the FCC Consent.

9.2     Representations and Warranties of DBC.

DBC hereby represents and warrants to Licensee that:

(a)     Authority.  DBC is a corporation duly organized, validly existing and in good standing under the laws of the State of Delaware and has full power and authority to own its properties and to carry out all its transactions as contemplated by this Agreement.  All requisite resolutions and other authorizations (except FCC Consent) necessary for the execution, performance, and satisfaction of this Agreement by DBC have been duly adopted and complied with prior to execution of this Agreement, including, but not limited to, corporate authority for execution of this Agreement by a duly authorized executive officer of DBC.

(b)     No Judgments.  There are no proceedings, judgments, investigations, or litigation existing or, to the best of DBC's knowledge, threatened against DBC that (i) would have a material adverse effect on DBC's ability to perform its obligations under this Agreement; or (ii) would or could have a material adverse effect on the solvency or financial condition of DBC.

(c)     No Disqualification.  DBC knows of no fact or circumstance that would disqualify it from performing its undertakings hereunder (save for the FCC Consent), and neither DBC nor any of its principals or its Affiliates will do any act, cause any act to be done, or fail to take any action that would so disqualify them.  DBC is qualified under FCC Rules to lease the Leased Transmission Capacity.

9.3     Representations and Warranties of Licensee.

Licensee represents and warrants to DBC that:

(a)     Licenses.  The licenses that form the Leased Transition Capacity were granted pursuant to Final Orders of the FCC.  Stations WMX344 and WMX358 each have a current expiration date of May 1, 2011.

(b)     No Judgments.  There are no proceedings, judgments, investigations, or litigation existing or, to the best of Licensee's knowledge, threatened against Licensee or the Licenses that (i) would have a material adverse effect on Licensee's ability to perform its obligations under this Agreement; (ii) would or could have a material adverse effect on the solvency or financial condition of Licensee; (iii) affect the validity, term, functionality, service area, authorization, or status of the Licenses or the Transmission Capacity, except for proceedings affecting BRS licensees generally; or (iv) question the ability of Licensee to enter into this Agreement.

(c)     Authority.  Licensee is in good standing under the laws of the State of South Dakota, and has full power and authority to own its property and to carry out all of the transactions contemplated by this Agreement. As of the execution date, Licensee has all requisite consents, approvals, authorizations, corporate resolutions and authorizations necessary for the execution, delivery, performance, and satisfaction of this Agreement (except for FCC Consent). Licensee knows of no Governmental Authority's determination that would disqualify it from performing its undertakings hereunder, and neither Licensee nor any of its principals or

its Affiliates will do any act, cause any act to be done, or fail to take any action that would so disqualify any of them.

      (d)    Reserved.

      (e)    Filings; Other. All material documents required to be filed by Licensee with the FCC or any other governmental entity with respect to the Licenses have been filed or the time period for such filing has not lapsed. The Licenses are not subject to any conditions other than those appearing on the face of the Licenses and those imposed by FCC Rules upon BRS licenses or the BRS industry generally. Licensee has not executed any interference consent agreement or letter, nor has it allowed any interference, with respect to the Licenses that would result in interference to the Channels following Transition in excess of the level of interference allowed by FCC Rules. Licensee complies in all material respects and, at all times since issuance of the Licenses, has complied in all material respects with applicable Laws and FCC Rules, including (a) the rules, regulations and policies pertaining to eligibility to hold the Licenses and (b) the rules, regulations and policies restricting foreign ownership of radio licenses. No person or entity other than Licensee is authorized to use the Transmission Capacity either now or in the future.

## ARTICLE X

## Events of Default and Termination

    10.1   Termination.

      (a)    Termination Rights. This Agreement may be terminated prior to expiration of the Term under any of the following circumstances:

      (i)    Reserved.

      (ii)    Termination Without Default. The Parties may terminate this Agreement by (x) mutual written agreement at any time or (y) pursuant to the provisions of Section 13.5 hereof. In the event of termination pursuant to this paragraph, the Agreement shall terminate without further liability, penalties or damages of any kind owing from one Party to the other.

      (iii)    Termination With Default. Licensee may terminate this Agreement upon giving written notice to DBC of an Event of Default (as hereinafter defined). DBC may terminate this Agreement upon giving written notice to Licensee of an Event of Default. In the event of termination pursuant to this paragraph, the non-defaulting Party shall have the right to terminate this Agreement, seek indemnification from the defaulting Party, seek its remedies at law and in equity, or seek any combination of the foregoing.

      (iii)    Termination for FCC License Revocation or Failure to Receive FCC Approval. Either Party may terminate this Agreement upon giving written notice to the other Party, within thirty (30) days of the FCC's termination or revocation of the Licenses by

Execution Version

Final Order, or the FCC's denial of the FCC Short Term Lease Application by Final Order, or if the FCC has not granted, by Final Order, the FCC Short Term Lease Application within six months of the execution of this Agreement. In the event of termination pursuant to this paragraph, if neither Party is responsible for an Event of Default leading to termination of this Agreement, then the Agreement shall terminate without further liability, penalties or damages of any kind owing from one Party to the other. If the FCC denies the FCC Short Term Lease Application by Final Order, the Parties shall, for a period of sixty (60) days, use good faith efforts to enter into a new or modified spectrum lease for the Channels. If the FCC denies the FCC Short Term Lease Application due to the failure of either Party to perform or observe any material term, obligation, or covenant contained herein, then the non-defaulting Party shall be entitled to all remedies available at law and in equity, and the defaulting party shall not have the right to terminate.

(b)    Default. It shall be an "Event of Default" hereunder if either Party fails to perform a material obligation or covenant or breaches a material representation and warranty contained in this Agreement, and the defaulting Party fails to cure such default within sixty (60) days following the receipt of written notice from the non-defaulting Party, except with respect to a failure to make any payment of money, in which case the defaulting Party shall have thirty (30) days to cure; provided however, that if the defaulting Party proceeds with due diligence during such sixty (60) day period with respect to any failure to perform other than a failure to make any payment of money and is unable, because of circumstances beyond its control or because of the nature of the default, to cure such default within sixty (60) days, the time for cure shall be extended, but in no event beyond one hundred twenty (120) days after receipt of written notice from the non-defaulting Party.

(c)    Special Temporary Authority. In the event the Licenses are terminated or revoked, or this Agreement is terminated, for any reason except as a result of an Event of Default by DBC, the Parties shall cooperate in seeking special temporary authority from the FCC to allow DBC to continue operating on the Channels until such time as it can transition its users to other spectrum and minimize service disruption to its business and other activities.

(d)    Early Termination Notice. If this Agreement is terminated early, the Parties must file with the FCC, pursuant to Section 1.9035(h)(3) of the FCC's Rules, within ten (10) days of the early termination date, a notification that this Agreement has been terminated earlier than the Termination Date and indicating the early termination date.

10.2    Remedies in Addition to Termination.

(a)    Remedies for Default. After the occurrence of an Event of Default, the non-defaulting Party shall have the right to terminate this Agreement, seek indemnification from the defaulting Party, seek its remedies at law and in equity in respect thereof, or seek any combination of the foregoing.

(b)    Specific Performance. Each Party acknowledges and agrees that the other Party may be damaged irreparably in the event any provision of this Agreement is not performed

*DBC Confidential and Proprietary*

Execution Version

in accordance with its specific terms or otherwise is breached, so that the other Party shall be entitled to injunctive relief to prevent breaches of the provisions of this Agreement and to enforce specifically this Agreement and the terms and provisions hereof in addition to any other remedy to which such Party may be entitled, at law or in equity. In particular, the Parties acknowledge that the Licenses are unique and recognize and affirm that in the event either Party breaches this Agreement in a manner that places the Licenses at risk of loss or other sanction, money damages would be inadequate and the other Party would have no adequate remedy at law, so that such other Party shall have the right, in addition to any other rights and remedies existing in its favor, to enforce its rights and the defaulting Party's obligations hereunder not only by action for damages but also by action for specific performance, injunctive, and/or other equitable relief.

10.3    Bankruptcy or Insolvency Termination.

If either Party shall cease doing business as a going concern and, without assigning its obligations hereunder pursuant to Section 13.8, make an assignment for the benefit of creditors, admit in writing an inability to pay its debts as they become due, file a voluntary petition in bankruptcy, be adjudicated bankrupt or insolvent, file a petition seeking for itself any reorganization, composition, readjustment, liquidation, dissolution or similar arrangement under any present or future statute or regulation, or file an answer admitting the material allegations of a petition filed against it in any such proceeding, or consent to or acquiesce in the appointment of a trustee, receiver, or liquidator of it or of all or any substantial part of its assets or properties, or if it shall take any action designed to obtain its dissolution or liquidation, or within thirty (30) days after the commencement of any proceedings against it seeking reorganization, readjustment, liquidation, dissolution or similar relief under any present or future statute or regulation, fail to have such proceeding dismissed, or if within thirty (30) days after the appointment, without the Party's consent or acquiescence, of any trustee, receiver or liquidator of it or of all or any substantial part of its assets or properties such appointment shall not vacate, the other Party may terminate this Agreement upon ten (10) days written notice thereof to the defaulting Party. Any act or event entitling one Party to terminate this Agreement under this Section shall, for all purposes of this Agreement, constitute a default in and failure by the other Party to perform its obligations under the terms of this Agreement.

## ARTICLE XI

### Dispute Resolution

11.1    Dispute Resolution.

In the event any controversy, claim, breach, dispute, difference or misunderstanding arises out of or relates to this Agreement or any term or condition hereof, the respective representatives designated by the Parties shall meet and negotiate in good faith in an attempt to amicably resolve such controversy, claim, dispute, difference or misunderstanding within twenty (20) business days, or such other time period mutually agreed to by the Parties, after such controversy, claim, dispute, difference or misunderstanding arises. If the Parties are unable to

**Execution Version**

resolve the controversy, claim, dispute, difference or misunderstanding, either Party may initiate arbitration in accordance with the provisions of Section 11.2 below. If the Party initiating dispute resolution procedures is Licensee, then the meeting and the arbitration shall be initiated in Ashburn, Virginia. If the Party initiating dispute resolution procedures is DBC, then the meeting and the arbitration shall be initiated in Sioux Falls, South Dakota.

     11.2   Arbitration.

Subject to the limitations of Section 11.1 and Article XII, if a dispute arises out of or relates to this Agreement or its breach, and is not resolved through the procedures provided in Section 11.1 above, then, within thirty (30) days after the expiration of the twenty (20) business day period provided in Section 11.1 above, either Party shall have the right to submit the dispute to binding arbitration by a panel of three arbitrators selected by the Parties, which arbitration shall be governed by the rules of the American Arbitration Association, and judgment on the award may be entered in any court having jurisdiction. Within fifteen (15) days of the commencement of the arbitration, each Party shall select an arbitrator. The two selected arbitrators shall select a third, neutral arbitrator within ten (10) days of the appointment of the last selected arbitrator. Neither Party may appeal such award to any court. The arbitrators may determine issues of arbitrability, but may not award punitive damages or limit, expand or otherwise modify the terms of this Agreement. The Parties, their representatives, other participants and the arbitrators shall hold the existence, content and result of the arbitration in confidence, except as such disclosure may be necessary for the purpose of recording or otherwise acting upon an arbitrator's award. The costs and expenses of the arbitrators shall be shared equally by the Parties or allocated as otherwise determined in the arbitration award.

     11.3   Provisional Remedies.

Notwithstanding anything in this Agreement to the contrary, for actions that are subject to arbitration, the Parties shall each have the right to file with (a) a court of competent jurisdiction an application for temporary or preliminary injunctive relief, writ of attachment, writ of possession, temporary protective order, or appointment of a receiver or (b) the FCC, if the arbitration award to which the applicant may be entitled may be rendered ineffectual in the absence of such relief or if there is no other adequate remedy. This application shall not waive a Party's arbitration right under this Agreement.

## ARTICLE XII

### Limitation of Liability

IN NO EVENT SHALL EITHER PARTY BE LIABLE IN ANY WAY, REGARDLESS OF THE FORM IN WHICH ANY LEGAL OR EQUITABLE ACTION MAY BE BROUGHT (WHETHER IN TORT, CONTRACT, STRICT LIABILITY OR OTHERWISE), FOR ANY LOSS OF USE, INTERRUPTION OF BUSINESS, LOST PROFITS, SALES, DATA OR GOODWILL, COSTS OF PROCURING SUBSTITUTE GOODS OR SERVICES, OR ANY SPECIAL, INCIDENTAL, INDIRECT, PUNITIVE OR CONSEQUENTIAL DAMAGES

*DBC Confidential and Proprietary*

WHATSOEVER, HOWEVER CAUSED, EVEN IF THE PARTIES HAVE BEEN ADVISED
OF THE POSSIBILITY OF SUCH LOSS OR DAMAGE, AND REGARDLESS OF
WHETHER THESE LIMITATIONS CAUSE ANY REMEDY TO FAIL OF ITS ESSENTIAL
PURPOSE. The limitations of liability in this Article, are material conditions to the Parties'
entering into this Agreement, without which the Parties would be unwilling to enter into this
Agreement, and will survive any termination or expiration of this Agreement.

## ARTICLE XIII

### Miscellaneous

13.1    Benefit.

Each Party hereto intends that this Agreement shall not benefit or create any right or
cause of action in or on behalf of any party not a signatory hereto or referenced herein other than
DBC and Licensee and their respective successors and permitted assigns.

13.2    Press Announcements.

No announcement to the press or general public of this Agreement or the terms or
conditions thereof (not including statements made to, or filings with, the FCC, or as otherwise
may be required by law) shall be made unless such announcement or release shall have been
approved in advance by both Parties.

13.3    Confidential Information.

Pursuant to this Agreement and the performance thereof, Licensee may receive non-
public proprietary information relating to the plans and/or operations of DBC and its affiliates,
parents and subsidiaries ("Confidential Information"). Confidential Information includes, but is
not limited to, information regarding vendors, customers and lender arrangements, line-of-sight
and other customer calculations, leasing terms and arrangements, product/service specifications,
prototypes, computer programs, models, drawings, acquisition plans, financing plans and
arrangements, marketing plans, business plans, financial data, personnel statistics and any similar
non-public or otherwise confidential or sensitive information. Licensee shall not use for itself,
except in performance of the Agreement, or disclose to any third person, firm, corporation or
other entity this Agreement or any Confidential Information, except (a) information that was
gained independent of Licensee's relationship with DBC and become publicly available through
no breach of any obligation of confidentiality by Licensee; (b) information that is communicated
to a third party with the prior written consent of DBC; or (c) information that is required to be
disclosed pursuant to the lawful order of a Governmental Authority or disclosure that is required
by operation of law, but in such event, only to the extent such disclosure is required and, to the
extent reasonably practicable, prior written notice must be given to allow DBC to seek a
protective order or other appropriate remedy or (d) information about the Agreement that is
required to be disclosed to the Securities Exchange Commission. In the event of a beach or
threatened breach of the terms of this Section, DBC shall be entitled to seek an injunction

*DBC Confidential and Proprietary*

prohibiting any such breach. Any such injunctive relief shall be in addition to, and not in lieu of, any appropriate relief in the way of money damages or any other remedies available at law or in equity. DBC may disclose this Agreement to its affiliates, strategic partners, actual or potential investors, lenders, acquirers, merger partners, and others whom DBC deems in good faith to have a need to know such information for purposes of pursuing a transaction or business relationship with DBC, so long as DBC secures an enforceable obligation from such third party to limit the use and disclosure of Confidential Information as provided herein.

### 13.4    Entire Agreement.

This Agreement, together with any written amendments, exhibits, appendices and/or schedules, constitutes the entire agreement between Licensee and DBC with respect to the subject matter addressed herein. This Agreement can be modified only by written instrument executed by each of the Parties. No collateral or prior statements, representations, understandings, agreements or warranties, express or implied, are part of this Agreement. This Agreement shall be binding upon the Parties, and their permitted successors, legal representatives, and assigns of the rights and duties hereunder. DBC and Licensee intend this Agreement to be a valid legal instrument and no provision of this Agreement which shall be deemed unenforceable shall in any way invalidate any other provision or provisions of this Agreement, all of which shall remain in full force and effect.

### 13.5    Compliance with Applicable Law.

Licensee and DBC agree that all of the acts contemplated by this Agreement shall be performed in strict compliance with all applicable provisions of the Communications Act of 1934, as amended; FCC Rules; any order, license, permit, waiver or other authorization of the FCC issued with respect to the subject matter hereof; as well as any other applicable statutes and governmental requirements. If (i) Congress or the FCC amend the Communications Act, FCC Rules or applicable law in a manner that requires amendment of this Agreement, or (ii) the FCC determines that this Agreement should or must be amended or (iii) any court of competent jurisdiction interprets the Communications Act, FCC Rules or applicable law in a way that results in this Agreement violating the Communications Act, FCC Rules or any applicable law, then the Parties shall promptly negotiate in good faith to reform and amend this Agreement so as to bring it into compliance with the Communications Act, FCC Rules or applicable law (unless the offending terms are grandfathered). Such reformation or amendment shall afford the Parties the benefit of the bargain and preserve, insofar as possible, the original intent of this Agreement and the respective rights and obligations of the Parties. If satisfactory reformation or amendment of the Agreement is not achievable by the Parties, then the Party who cannot substantially realize the benefit of its bargain hereunder, may terminate this Agreement in writing; provided, however, that such termination shall not relieve either Party of its prior obligations. If the non-terminating Party ("Non-Terminating Party") objects to termination by the other Party ("Terminating Party"), the Non-Terminating Party shall provide written notice of such Party's objection within ten (10) business days of receipt of the Terminating Party's notice and the Parties shall meet within ten (10) business days of the date of the objection notice to discuss the Terminating Party's reason for termination and attempt to resolve any disagreement about

**Execution Version**

whether the Terminating Party has a right to terminate pursuant to this Section 13.5. If the Parties cannot resolve the matter, they shall arbitrate the dispute in accordance with Article XI.

### 13.6   Governing Law.

This Agreement shall be governed by, and construed and enforced in accordance with the Communications Act, the FCC Rules and the internal laws of the State of South Dakota without giving effect to any choice or conflict of law provision or rule (whether of the State of South Dakota or any other jurisdiction) that would cause the application of the laws of any jurisdiction other than the State of South Dakota. To the extent applicable under South Dakota law and the terms of this Agreement, any legal proceeding that may result from a dispute as to the interpretation or breach of any of the terms of this Agreement shall be brought in the courts for the State of South Dakota and venue for any such proceeding shall be proper only in South Dakota.

### 13.7   Further Action.

After the execution of this Agreement, the Parties shall take such further action and execute such further documents, assurances, and certificates as either Party reasonably may request of the other to effectuate the transactions contemplated by this Agreement. In addition, each Party agrees that it will not take any action that would adversely affect the rights granted by it to the other Party hereunder.

### 13.8   Assignments.

(a)   Eligibility for Transfer or Assignment. Subject to all applicable restrictions contained in this Agreement, Licensee shall only sell, assign, or transfer its interest in the Licenses to a person or entity that is eligible or qualified to hold the Licenses under applicable FCC Rules. DBC shall not sell, assign, or transfer its interest in this Agreement with any person or entity that is not eligible or qualified to lease the spectrum under applicable FCC Rules.

(b)   DBC Assignment. Pursuant to Section 1.9035(j) of FCC Rules, DBC may assign this Agreement to another entity, provided that (in the case of assignments that are not pro-forma) Licensee has consented to such assignment (such consent not to be unreasonably withheld, delayed or conditioned), the assignee agrees in writing to assume DBC's obligations under this Agreement, and the assignment of the Agreement is approved by the FCC after the Parties file an FCC Short Term Lease Application. Licensee agrees that it shall, under all circumstances, consent to a sale, assignment, or transfer of the Agreement to (i) a non-Affiliate successor entity to DBC with an equity book value of at least $10 million or (ii) an Affiliate of DBC. Pursuant to Section 1.9035(k) of FCC Rules, DBC may undergo a transfer of control (other than a pro forma transfer of control) during the Term of this Agreement, provided it first obtains FCC Consent. Upon assignment or transfer of this Agreement by DBC pursuant to the foregoing, the assignee or transferee will be solely responsible for the obligations of DBC hereunder and DBC shall be relieved and discharged of all responsibilities, liabilities and

*DBC Confidential and Proprietary*

obligations. Each Party shall be entitled, without the consent of the other Party, to undertake a pro forma assignment or transfer of this Agreement, or its rights hereunder, and shall provide notice to the other Party and notice to the FCC as required by Sections 1.9035(j) and (k).

(c)     Licensee Assignment. Licensee shall not assign its Licenses without consulting with DBC and securing its agreement, not to be unreasonably withheld during the Term of this Agreement.

(d)     DBC Sublease. Pursuant to 1.9035(m) of the FCC's Rules, DBC will not sublease capacity on the Leased Transmission Capacity.

(e)     Licensee Release. Upon the valid consummation of the sale, assignment or transfer of the Licenses to any Successor Licensee as described in this Section 13.8, the execution by such Successor Licensee of an assignment and assumption agreement with respect to this Agreement, and the expiration of any applicable FCC reconsideration periods for such assignment or transfer: (i) Licensee will be released and discharged from all obligations to DBC arising thereafter; and (ii) Licensee will not incur any penalties as a result of and will not be responsible for any of DBC's expenses associated with the sale, assignment or transfer, except that nothing shall release Licensee from any liabilities incurred prior to the execution of such assignment and assumption agreement.

(f)     Ownership of Equipment. DBC shall be the owner of any facilities or equipment purchased, owned or installed by DBC pursuant to this Agreement and Licensee shall be the owner of any facilities or equipment purchased, owned or installed by Licensee pursuant to this Agreement. Any equipment used by DBC in deploying service on the Channels shall be type accepted and approved by the FCC for use.

13.9    Notices.

Any notices and documentation given under this Agreement shall be in writing and shall be deemed given (i) on the first (1st) business day (excluding Federal holidays) after being sent by United States Express Mail, return receipt requested, (ii) on the fourth (4th) business days after mailing by prepaid registered or certified United States Mail, (iii) the date delivered after being sent by overnight delivery, or (iv) on the date delivered by hand delivery to the other Party at the following address:

Licensee:          Don L. Marker
                   Sioux Valley Rural Television, Inc.
                   P.O. Box 216
                   Colman, SD 57017
                   Facsimile Number: 605-256-1693

Copies (which shall not itself constitute notice):

                   R. Alan Peterson

Lynn, Jackson, & Shultz LeBrun, P.C.
141 N. Main Avenue, Suite 900
P.O. Box 2700
Sioux Falls, SD 57104-2700
Facsimile Number: 605-332-4249

DBC:          William F. Wallace
              DigitalBridge Communications Corp.
              44675 Cape Court, Suite 130
              Ashburn, VA 20174
              Facsimile Number:  703-858-1083

Copies (which shall not itself constitute notice):

              Jennifer L. Richter, Esq.
              Patton Boggs, LLP
              2550 M Street, NW
              Washington, DC  20037
              Facsimile Number:  202-457-6315


13.10   Headings.

The headings of each Article and Section of this Agreement and the arrangement of the
provisions herein are for convenience only and shall not affect the interpretation of any provision
of this Agreement herein. Unless otherwise stated, references in this Agreement to Sections refer
to the Sections of this Agreement.

13.11   Construction.

The Parties intend that the Leased Transmission Capacity will be used by DBC to provide
an array of services selected by DBC in accordance with its business plan, as such business plan
may evolve from time to time, and the Parties anticipate that the architecture of the wireless
system and its Services will evolve in accordance with technological developments and DBC's
plans to employ technological developments in its business. Accordingly, it is the intention and
the agreement of the Parties that this Agreement shall be understood and interpreted in an
expansive fashion to adapt to and permit the utilization of such changes in technology, consistent
with applicable legal requirements and the Parties' rights hereunder. Each Party acknowledges
and represents that, in executing this Agreement, it has had the opportunity to seek advice as to
its legal rights from legal counsel and that the person signing on its behalf has read and
understood all of the terms and provisions of this Agreement.  DBC and Licensee have
participated jointly in the negotiation and drafting of this Agreement.  In the event an ambiguity
or question of intent or interpretation arises, this Agreement shall be construed as if drafted
jointly by DBC and Licensee and no presumption or burden of proof shall arise favoring or
disfavoring either Party by virtue of the authorship of any of the provisions of this Agreement.

*DBC Confidential and Proprietary*

**Execution Version**

All pronouns and any variations thereof shall be deemed to refer to the masculine, feminine, neuter, singular or plural as the context may require.

13.12  Counterparts.

This Agreement and any amendments, waivers, consents or supplements thereto may be executed in two or more counterparts, each of which when executed shall be deemed to be an original and all of such counterparts shall be deemed to be one and the same instrument.

13.13  Waiver.

The waiver by either Party of a breach of any provision of this Agreement shall not operate as a waiver of any subsequent breach thereof. To be effective, any such waiver must be in writing and signed by an authorized official of Licensee or DBC, as the case may be. No investigation by a Party, whether before or after the date first stated above, shall be deemed to limit the rights or responsibilities of that Party under this Agreement.

13.14  Survival.

All obligations of DBC or Licensee which by their nature involve performance after the end of the Term, or which cannot be ascertained to have been fully performed until after the end of the Term, will survive the expiration or termination of the Term.

13.15  Force Majeure.

Notwithstanding anything contained in this Agreement to the contrary, neither Party shall be liable to the other for failure to comply with any obligation under this Agreement (nor shall any charges or payments be made in respect thereof) if prevented from doing so by reason of the elements, fires, strikes, labor unrest, embargoes, acts of war, terrorism, civil commotion, government allocation of materials, rationing or other orders or requirements, acts of civil or military authorities, acts of God, acts or omissions or failures of carriers or utilities, unavailability of government-approved equipment for use in the BRS band, or other contingencies beyond the reasonable control of the Parties; and all requirements as to notice and other performance required hereunder within a specified period shall be automatically extended to accommodate the period of pendency of any such contingency which shall interfere with such performance.

IN WITNESS WHEREOF, each of the Parties hereto has caused this Agreement to be executed by its duly authorized officer as of the date first written above.

SIOUX VALLEY RURAL TELEVISION, INC.

By: _____

Name: Don L. Macker

Title: GM/CEO

DIGITALBRIDGE SPECTRUM CORP.

By: _____

Name: William F. Wallace

Title: EVP

# SUZANNE S. GOODWYN, ESQ.

1234 TOTTENHAM COURT
RESTON, VIRGINIA 20194
E-mail: goodwynlaw@verizon.net

TELEPHONE: (703) 444-8804

FACSIMILE: (703) 991-0629
* admitted to practice in Virginia and District of Columbia

December 23, 2014

Via Express Mail and Facsimile (605-256-1693)
Mr. Don L. Marker
Sioux Valley Rural Television, Inc.
P.O. Box 216
Colman, SD 57017

Re:    **Both Long Term de Facto Spectrum Lease Agreements by and
between Digitalbridge Spectrum Corp. and Sioux Valley Rural
Television, Inc. ("SVRTV"), dated July 13, 2011, both of which
were assumed by SpeedConnect LLC ("SpeedConnect") on
June 29, 2012 (the "Lease Agreements")**
**NOTICE OF DEFAULT**

Dear Mr. Marker:

Pursuant to Section 13.9 of the above-referenced Lease Agreements, this is to
inform you that Sioux Valley Rural Television, Inc. is in default of Section 7.3(d) of both
such agreements. On December 18, 2014, a press release was issued stating that SDN
Communications was in the process of buying SVRTV. Section 7.3(d) of the Lease
Agreements, which is entitled "Provide Information," specifically states that "…The
Parties shall provide each other with prompt written notice of any conversation with the
FCC or *third parties* that would be reasonably likely to materially and adversely affect
either party's rights under the Agreement…[emphasis added]". This provision was put in
so that the Party seeking a material change would be obligated to inform the other Party
of such possible changes to the leasing arrangement and to provide that other Party with
reasonable opportunity to participate in or voice its concerns about such action. A sale of
a Party's rights under the Lease Agreements would be a material change included under
the provision. However, SVRTV failed to provide such notice and has announced
publicly it is moving forward with a sale to another entity.

This is particularly egregious as SpeedConnect stated numerous times in meetings
with at least two Chief Executive Officers of SVRTV and its Board Chairman, as well as
other officers of SVRTV, that it was very interested in purchasing the company if it was
ever offered for sale and wanted to be notified if such an event were to occur. As a
gesture of good faith towards that end and in keeping good relations with SVRTV,
SpeedConnect has allowed SVRTV, without written agreement, to use one of
SpeedConnect's mid-band channels for several years. Yet when SVRTV started



Mr. Don Marker
December 23, 2014
Page 2

corresponding with a third part on exactly this issue, SpeedConnect was provided no such notice, neither as a courtesy nor as required under the Lease Agreements.

Accordingly, SVRTV has committed a breach pursuant to Section 10.1(b) of both Lease Agreements. As such, SVRTV now has sixty (60) days to cure such default by providing SpeedConnect an opportunity to enter into good faith discussions with SVRTV to purchase its wireless system. Please note that any conversations with SDN Communications regarding SpeedConnect's interest under the Lease Agreements would also fall under Section 7.3(d) of such agreements and requires SVRTV to provide written notice to SpeedConnect of all such discussions.

Please contact my client, John Ogren, at (248) 521-0621 at your earliest convenience so that the negotiations may begin. Feel free to contact me with any questions.

Very truly yours,

Suzanne S. Goodwyn
Counsel to SpeedConnect

cc:     R. Alan Peterson, Esq. (605-332-4249)
        David Nace, Esq. (by electronic mail)
        John Ogren (by electronic mail)

RECEIVED JAN 1 3 2015

# Howard & Howard

### law for business·

| Ann Arbor | Chicago | Detroit | Las Vegas | Peoria |
|-----------|---------|---------|-----------|--------|

direct dial: 248.723.0353          Henry J. Brennan          HBrennan@howardandhoward.com

January 12, 2015

Via Express Mail and Facsimile (605-256-1693)

Mr. Tim McCarthy
Sioux Valley Rural Television, Inc.
P.O. Box 216
Colman, SD 57017

```
EXHIBIT
3
```

Re:     **Long Term de Facto Spectrum Lease Agreement by and
        between Digitalbridge Spectrum Corp. ("DBC") and Sioux Valley
        Rural Television, Inc. ("SVRTV"), dated July 13, 2011, in which DBC
        leased use of its spectrum to SVRTV and which was assumed by
        SpeedConnect LLC ("SpeedConnect") as licensee on June 29, 2012 (the
        "Lease Agreement")
        AFFIRMATION OF NOTICE OF DEFAULT**

Dear Mr. McCarthy:

        This is in response to the letter sent to SpeedConnect on December 30, 2014, from R.
Alan Peterson of Lynn, Jackson, Shultz & LeBrun, P.C., counsel to SVRTV, and to the
conference call held Thursday, January 8, 2015, between principals and counsel for Sioux Valley
Energy, SVRTV and SpeedConnect.

        As noted in Suzanne S. Goodwyn's letter of December 22, 2014 SVRTV is in material
breach of the Lease Agreement.  Section 7.3(d) of the Lease Agreement specifically states that
SVRTV was to provide SpeedConnect with all correspondence generated by SVRTV or any
third party and provide prompt written notice of any conversation with such third parties that
relate to the Licenses and which would be reasonably likely to materially and adversely affect
SpeedConnect's rights under the Lease Agreements.   The sale of SVRTV to SDN
Communications ("SDN") a competitor and vendor to SpeedConnect would clearly have a
material and adverse effect on SpeedConnect.  If SpeedConnect had been made aware of Sioux
Valley's Energy's interest in selling SVRTV, there were a number of actions SpeedConnect
could have and would have undertaken, including making a higher and better bid.  In this regard,
SpeedConnect, or its representatives, stated numerous times to Tim McCarthy and Jake
Vandewater and various Board members of Sioux Valley Energy that it was very interested in
purchasing the company and in fact submitted a written offer to that effect.  After submitting a

written offer SpeedConnect was told that there was no interest in selling SVRTV, however, Tim McCarthy and Jake Vandewater assured John Ogren that if it were ever under consideration to sell SVRTV, SpeedConnect would be given the opportunity to make an offer. In consideration of these assurances, SpeedConnect made certain of the "G" group channels available to SVRTV at no charge.

During the conference call held on January 8th, Sioux Valley Energy, as owner, and SVRTV, as lessee, clearly stated that they had no intention to cure the default claiming that a binding agreement had been entered into with SDN. SpeedConnect thusly affirms its letter of December 22, 2014, that SVRTV has breached its obligations under the Lease Agreement and is in default thereunder. Therefore, SpeedConnect hereby wishes to make clear that pursuant to Section 10.1(a)(ii) and 10.1(b) the Lease Agreement shall be terminated on Monday, March 23, 2015 (60 days following notice of default).

Further, as you no doubt are aware, in addition to all other legal/equitable rights and remedies available to SpeedConnect, Section 11.1 of the Lease Agreement requires the Parties to meet and negotiate within twenty (20) business days following a dispute arising. We calculate the outside date for meeting to be January 26, 2015 and are ready, willing and able to meet at a mutually agreeable time in Sioux Falls prior thereto.

Please note that SpeedConnect maintains any ongoing conversations with SDN regarding the Lease Agreement falls under Section 7.3(d) and requires written notice to SpeedConnect of all such discussions until termination of this agreement.

Very truly yours,

Henry J. Brennan
Counsel to SpeedConnect

cc:    Mr. R. Alan Peterson (by electronic mail)
       Mr. John Ogren (by electronic mail)

4841-4035-1265, v. 1

Howard & Howard
law for business

01/28/2015 WED 13:59  FAX 248 645 1568 Howard & Howard PLLC                    @002/003

# Howard &amp; Howard

### law for business·

| Ann Arbor | Chicago | Detroit | Las Vegas | Peoria |
|-----------|---------|---------|-----------|--------|

direct dial: 248.723.0353            Henry J. Brennan            HBrennan@howardandhoward.com

January 27, 2015

Via Express Mail and Facsimile (605-256-1693)

Mr. Tim McCarthy
Sioux Valley Rural Television, Inc.
P.O. Box 216
Colman, SD 57017



**EXHIBIT**
**4**

Re:    **Long Term de Facto Spectrum Lease Agreement by and**
        **between Digitalbridge Spectrum Corp. ("DBC") and Sioux Valley**
        **Rural Television, Inc. ("SVRTV"), dated July 13, 2011, in which DBC**
        **leased use of its spectrum to SVRTV and which was assumed by**
        **SpeedConnect LLC ("SpeedConnect") as licensee on June 29, 2012**
        **(the "Lease Agreement")**
        **<u>AFFIRMATION OF NOTICE OF DEFAULT</u>**

Dear Mr. McCarthy:

        This is a follow-up to our letter of January 12, 2015 regarding default of the above-referenced Lease Agreement. SpeedConnect hereby puts SVRTV on further notice under Section 10.1(b) of the Lease Agreement that in addition to being in material breach for reasons stated in the letter of SpeedConnect's telecommunications counsel, Suzanne Goodwyn, on December 23, 2014, it is also in material breach of Section 6.4 of the Lease Agreement. Section 6.4 specifically states that SVRTV shall protect SpeedConnect from interference at the boundaries of the West and North Market Areas within the GSA that is licensed to SpeedConnect and shall protect SpeedConnect from harmful interference that is not permitted under the rules of the Federal Communications Commission ("FCC"). SVRTV has continuously violated this provision and the technical parameters under which it is required to operate under the FCC rules, causing SpeedConnect continuous and harmful interference that has materially and adversely affected the service it provides to its customers. Accordingly, SVRTV has sixty (60) days in which to remedy such interference.

.

.

Mr. Tim McCarthy
Sioux Valley Rural Television, Inc.
January 28, 2015

Page 2

        We understand that John Ogren has sent you a separate note seeking technical information in order that SpeedConnect may begin to assess, identify and, hopefully, assist in resolving this interference. We encourage you to comply with Mr. Ogren's request.


                        Very truly yours,

                        Howard & Howard Attorneys PLLC


                        Henry J. Brennan
                        Counsel to SpeedConnect


cc:     Mr. R. Alan Peterson (Express Mail and Facsimile)
        Mr. John Ogren (by electronic mail)

4843-7799-8625, v. 1


Howard ⊠ Howard
law for business·

# Howard & Howard

### law for business·

| Ann Arbor | Chicago | Detroit | Las Vegas | Peoria |
|-----------|---------|---------|-----------|--------|

direct dial: 248.723.0353       Henry J. Brennan       HBrennan@howardandhoward.com

February 11, 2015

Miles F. Schumacher
Lynn, Jackson, Shultz & Lebrun, P.C.
110 N. Minnesota Avenue
Suite 400
P.O. Box 2700
Sioux Falls, SD  57101-2700



EXHIBIT
5

**Re:**    **Long Term de Facto Spectrum Lease Agreement by and
between Digitalbridge Spectrum Corp. ("DBC") and Sioux Valley
Rural Television, Inc. ("SVRTV"), dated July 13, 2011, in which DBC
leased use of its spectrum to SVRTV and which was assumed by
SpeedConnect LLC ("SpeedConnect") as licensee on June 29, 2012
(the "Lease Agreement")**
**AFFIRMATION OF NOTICE OF DEFAULT**

Dear Miles:

    In response to your letter dated January 30, 2015, first let me clarify the substance of our informal agreement. What I meant and intended, was that neither party would take any action relating to the initial default while we explored potential resolutions. Given that your clients were unwilling to engage in any substantial discussions we asked if we could speak with SDN, which you consented to. In this regard John Ogren spoke with the CEO of SDN seeking an agreeable business accommodation, but those talks were futile. As a result the initial default set forth in Attorney Goodwyn's letter of December 22, 2014 remains uncured and thus the Lease Agreement is subject to termination on February 23, 2015.

    Notwithstanding your objection, our letter of January 27, 2015 did not contravene our "standstill" because it did not constitute any action per se, it simply notified you and your client of an additional default under the Lease Agreement due to SVRTV's ongoing broadcast interference. Further, our understanding only contemplated withholding action while settlement alternatives were being pursued, we didn't agree to stand pat until the conclusion of any arbitration proceeding.

    Please note as a follow-up to our January 27th letter, a test was conducted last Thursday/Friday (February 5th/6th) which confirmed that SVRTV's operations are in fact causing

Miles Schumacher
February 11, 2015

Page 2


material and harmful interference to SpeedConnect's service in and around Sioux Falls.  We thus reiterate our demand that SVRTV remedy and resolve this interference issue as it also constitutes a material default under the Lease Agreement.

Hopefully this clarifies SpeedConnect's position and provides the basis for more productive discussions, as we stand ready and willing to resolve this matter without resorting to adversarial proceedings.


Very truly yours,

Howard & Howard Attorneys PLLC

Henry J. Brennan
Counsel to SpeedConnect


Cc:     John Ogren
        Suzanne Goodwyn, Esq.

4815-3336-1441, v. 1


| RECEIVED FEB 1 7 2015


Howard & Howard
law for business·